Jerry Lynn **BISBY**, Appellant,

v.

The **STATE** of Texas, State.

No. 2–93–528–CR.

Court of Appeals of Texas,
Fort Worth.

Oct. 5, 1995.

Rehearing Overruled Nov. 2, 1995.

Richard Alley, Alley & Pounds, Fort Worth, for appellant.

Tim Curry, Criminal District Attorney; Betty Marshall and Charles M. Mallin, Assistant Chiefs of Appellate Section; Tanya S. Dohoney, James Cook, Richard Bland, Assistant Criminal District Attorneys, Fort Worth, for appellee.

Before LIVINGSTON, DAUPHINOT and BRIGHAM, JJ.

## OPINION

LIVINGSTON, Justice.

A jury found Jerry Lynn Bisby ("appellant") guilty of the murder of A.W. Farmer

("A.W.") and assessed punishment of ninety-nine years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice. In four points of error, appellant appeals his conviction, arguing the trial court erred by: 1) permitting Jack Marshall Ford to testify; 2) admitting hearsay statements of A.W.; 3) admitting tape-recorded statements of Nancy Scruggs ("Nancy"); and 4) excluding appellant's testimony at the trial on punishment. We affirm.

## FACTS

On October 13, 1993, A.W. was living in Haltom City in the Haltom Oak Apartments. Jason Farmer ("Jason"), A.W.'s son, was working for his dad in his dad's construction business. Appellant also worked for A.W. from March or April 1993 until the first or second week of August 1993.

It was the policy of A.W.'s company, "[I]f you start a job, you finish the job or you don't get paid." The exceptions were if you gave two weeks' notice or you were fired. Appellant walked off the job in the first or second week of August, and so A.W. did not pay appellant.

In August 1993, A.W. began receiving phone calls and answering machine messages from appellant. Jason identified the voices on one tape as appellant and Nancy.

Robert Scruggs ("Robert"), appellant's brother-in-law, testified that on the morning of October 13, 1993, appellant asked him to "take a ride" with him. Robert agreed. Appellant told Robert that "he was going to go see somebody about getting some money." Appellant drove them to an apartment complex in the Haltom City area.

As they pulled into the apartment complex parking lot, appellant indicated that the man he was looking for was not there. Appellant then backed the car into a parking space, put the car in park, and made "small talk" over coffee. When a truck entered the parking lot ten or twelve minutes later, appellant said, "There he is."

When A.W. pulled in, appellant got out of the car, reached in the back seat for something, and walked toward A.W. Appellant had a pistol-grip shotgun he was loading. Appellant and A.W. began arguing, and appellant began hitting A.W. with the shotgun. Robert heard the shotgun fire.

Jack Ford ("Ford"), a neighbor, also testified at trial. On October 13, 1993, he was living in the Haltom Oak Apartments in Haltom City. Although Ford had never spoken with A.W., he knew who he was through Jason. At approximately 6:00 a.m. that morning, Ford noticed an unfamiliar vehicle backing into a parking space in the complex's parking lot. It was a large white car, and Ford could tell there were at least two people in it. None of the occupants exited the car while Ford was watching. As Ford went back to cooking his breakfast, he heard A.W.'s pickup truck pull into the complex.[1]

Ford heard loud arguing outside shortly after A.W. returned home. Ford walked to his window and saw A.W. by his pickup truck arguing with a man who was holding a shotgun. Ford saw the man fire the gun and run back toward the parked car and drive off.

After the gun was fired, Robert explained that appellant began running back toward the car and A.W. began "hollering for help." As appellant got in the car he said, "I think I blew part of his head and back away."

Pamela Lawson ("Lawson") also lived at A.W.'s apartment complex on October 13, 1993. Lawson was awakened that morning by cries for help, and her daughter told her someone had been shot. Lawson ran to the window and saw A.W. lying on the ground in the parking lot. Lawson told her daughter to call 911 and ran to the parking lot.

Officer Chambless of the Haltom City Police Department responded to the call. A.W. was taken by ambulance to John Peter Smith Hospital where he died from a gunshot wound to the back around 6:45 a.m.

## STANDARD OF REVIEW ON EVIDENTIARY ISSUES

■ When reviewing a trial court's determination to admit or to exclude evidence,

---

1. Ford explained that the decedent drove a diesel pickup truck, the only one in the complex, and Ford could recognize the sound of the motor on the diesel truck.

an appellate court "must afford a trial court great discretion in its evidentiary decisions." *Montgomery v. State*, 810 S.W.2d 372, 378 (Tex.Crim.App.1990). The appellate courts recognize that the trial judge is "in a superior position to evaluate the impact of the evidence." *Id.* at 379. "The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. Rather, it is a question of whether the court acted without reference to any guiding rules and principles." *Id.* at 380 (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986)). In other words, the reviewing court looks to see whether the act was arbitrary or unreasonable. *Id.* "[J]udicial rulings will be affirmed if the trial court follows the appropriate analysis and balancing factors, though the appellate court might disagree with the weight given to those individual factors." *Id.*

Further, it is well established that a correct ruling given for the wrong reason will not result in a reversal. *Calloway v. State*, 743 S.W.2d 645, 651–52 (Tex.Crim.App.1988). If the decision of the trial court is correct on any theory of law applicable to the case, it will not be disturbed on appeal. *Id.*

## ANALYSIS

### Oath or Affirmation Requirement

In his first point of error, appellant argues the State's witness Ford should not have been allowed to testify because he did not take an oath or affirmation sufficient to fulfill the requirements of rule 603 of the Texas Rules of Criminal Evidence or article 1.17 of the Texas Code of Criminal Procedure. At trial, Ford refused to take the standard oath based on religious reasons. After a lengthy exchange, the witness answered that he would "accurately and truthfully answer under penalty of perjury" the questions he was asked.[2]

On appeal appellant argues the "oath" taken by Ford was insufficient and Ford was,

---

2. THE COURT: Now, you understand that is the procedure that we use in Texas, is either have a witness swear or affirm that the testimony you're about to give shall be the whole truth and nothing but the truth so help you God. You understand that?

[FORD]: Well, I don't know how y'all do things. You know, I'm just—affirm is not—it's maybe close to the—I don't swear. I'm not going to swear. That's—

THE COURT: All right. That's fine.

[FORD]: That's the way it's stated and the way I don't want to do it.

THE COURT: Okay. And you do not feel that you can affirm either to the testimony you're about to give?

[FORD]: I will speak the truth. That's what I'll do.

THE COURT: All right. Now, listen to what I'm saying because I've got to get the legal ramifications of this out of the way and I want to emphasize to you no one wants to infringe upon your religious beliefs. Please understand that. But I've got a job to do and I've got to do it right.

The second oath that I would often present to people would be: Do you solemnly affirm that the testimony you are about to give shall be the truth, the whole truth, and nothing but the truth so help you God? As I understand, you cannot give at that one either, is this correct?

[FORD]: Yeah. A solemn oath is a swearing—same thing as a swearing thing. I can—

you know, if you want me to explain, I can, but....

THE COURT: Well, just as long as it's your religious views, we're not going to pursue it any further, if that's your religious beliefs, sir. You have to answer so we can get it—

[FORD]: Yes, sir.

THE COURT: All right. Now, there has been an article produced in the bar journal concerning a topic similar to this and the author recommends an oath similar to this one. In fact, I think this is one that they use in the state of California. And let me run this by you and see that if you could follow—agree with that oath. Would you do that, please?

Do you understand that you will—do you understand and agree that you will accurately and truthfully answer under penalty of perjury all questions propounded to you concerning the testimony you're about to give in this case and that you do understand further that failure to do so will subject you to criminal prosecution?

[FORD]: Yes, that's—I'll—I agree with that.

....

[DEFENSE COUNSEL OBJECTS]

THE COURT: ... [Defense counsel] raised a very interesting point and it's always interesting to see appellate courts write on these issues. Unfortunately, they may write on it in this case. But I'm going to—I'm going to permit the witness to testify based on the oath that I have roughed out to him which he understands. It is the oath—and I want to say

therefore, incompetent to testify at trial. Rule 603 of the Texas Rules of Criminal Evidence states:

Before testifying, every witness shall be required to declare that he will testify truthfully, by oath or affirmation administered in a form calculated to awaken his conscience and impress his mind with his duty to do so.

TEX.R.CRIM.EVID. 603. Article 1.17 of the Texas Code of Criminal Procedure provides:

No person shall be disqualified to give evidence in any court of this State on account of his religious opinions, or for the want of any religious belief; but all oaths or affirmations shall be administered in the mode most binding upon the conscience, and shall be taken subject to the pains and penalties of perjury.

TEX.CODE CRIM.PROC.ANN. art. 1.17 (Vernon 1977).

■ When reviewing a statute, we are instructed to read words and phrases in context and to construe them according to the rules of grammar and common usage. TEX. GOV'T CODE ANN. § 311.011 (Vernon 1988). Webster's defines an affirmation as "a solemn declaration made under the penalties of perjury by a person who conscientiously declines taking an oath." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 61 (1983). Black's Law Dictionary explains an affirmation is "[a] solemn and formal declaration or asseveration that an affidavit is true, that the witness will tell the truth, etc." BLACK'S LAW DICTIONARY 55 (5th Ed.1979). The advisory notes to rule 603 of the Federal Rules of Evidence, after which rule 603 of the Texas Rules of Criminal Evidence was modeled, explain that an "[a]ffirmation is simply a solemn undertaking to tell the truth; no special verbal formula is required." FED. R.EVID. 603 advisory committee's note. Our review of the record supports the conclusion that Ford agreed to a solemn undertaking that he would testify truthfully. Therefore, we find that while Ford may not have characterized what he took as an affirmation, it was in fact an affirmation.

■ In the alternative, if we interpret the situation as appellant suggests and conclude that Ford refused to give an oath or affirmation, we find the alternative given by the trial judge was sufficient to comply with rule 603 of the Texas Rules of Criminal Evidence and article 1.17 of the Texas Code of Criminal Procedure. When a trial judge is confronted by a witness who refuses on religious grounds to take an oath or an affirmation, the trial judge "should take reasonable steps to accommodate the witness's beliefs." 1 STEVEN GOODE ET AL., GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 603.1 at 524 (2d ed. 1993) (citing *Moore v. United States*, 348 U.S. 966, 75 S.Ct. 530, 99 L.Ed. 753 (1955); *Society of Separationists, Inc. v. Herman*, 939 F.2d 1207 (5th Cir.1991), *aff'd on reh'g on other grounds*, 959 F.2d 1283 (5th Cir.),[3] *cert. denied*, —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 135 (1992)). Faced with such a situ-

this now, sir, so there is no misunderstanding. That this oath that I'm about to administer to you in the presence of the jury will be just as important an oath as the two examples that I read to you earlier. Do you understand that?
[FORD]: Yes, sir.
THE COURT: And that when I say, "To tell the truth and nothing but the truth," failure to do so will subject you to perjury as quick as it would be if you were to swear or affirm the oath as most folks do. You understand that?
[FORD]: Yes, sir.
THE COURT: All right. And is there any question in your mind the seriousness of this undertaking and of the oath that you are about to receive?
[FORD]: No. No, sir.

THE COURT: In other words, I expect you to answer all questions with absolutely the best possible truth that you can give. Do you understand that?
[FORD]: Yes.
THE COURT: It is not a second-class oath.
[FORD]: Right.
THE COURT: It is an alternative oath.
[FORD]: Right.
THE COURT: All right.

3. The court of appeals on rehearing decided that the appellant did not have standing to bring her claim. The court did not comment on the guidelines it had set forth in its previous opinion for objections to oaths on religious grounds.

ation, the trial judge should "strive to devise, in consultation with the witness if necessary, some alternative form of 'serious public commitment to answer truthfully that does not transgress the prospect's sincerely held beliefs.'" *Id.*[4]

In this case, the trial judge devised an alternative form that evidenced a "serious public commitment to answer truthfully" while not transgressing upon the witness's beliefs. *Id.* Further, the alternative form was administered in a manner calculated to awaken Ford's conscience and to impress upon him his duty to tell the truth. Appellant's first point of error is overruled.

### Dying Declarations

In his second point of error, appellant argues the trial court erred by admitting into evidence the statements A.W. made in the presence of Ford and Lawson as dying declarations. The scenario leading to the statements began after Ford saw the unfamiliar parked car drive off. Ford began moving toward the parking lot to assist A.W. Ford could hear A.W. yelling, repeatedly, "Help me. I'm shot." When Ford reached A.W., A.W. was lying on his back and had "blood all over his face and a whole lot of blood on his clothing and shoulder area."

Ford asked A.W. where he had been shot, but A.W. did not reply. A.W. told Ford that he could not breathe and asked to be rolled over. Ford complied. Ford again asked A.W. where he had been shot, and A.W. replied, "In the back." Ford found the wound in the middle of the back "at the bottom of the lungs" and to the left of the spine. He could see blood "pulsing out [of the wound] with [A.W.'s] heartbeat."

A.W. continued to complain to Ford that he could not breathe, and Ford could see that A.W. was spitting up blood. A.W. could not move his legs. Although Ford was applying pressure to the wound in A.W.'s back, Ford told A.W. that he didn't think he was helping him. Ford observed A.W. losing a lot of blood through his mouth.

Lawson also went to the parking lot to assist. She heard A.W. yell, "Help. I've been shot. Help. I can't breathe. Hurry up. Hurry. I can't breathe." She reached A.W. after Ford had rolled him over. She could barely see A.W.'s face because of all of the blood. She testified that A.W. "was vomiting blood, blood bubbles, so it was real hard to see his face." Lawson could not tell if there were any other wounds because "[t]here was just too much blood. There—it was a ridiculous amount."

Ford asked A.W. who had shot him, and A.W. replied, "Jerry Beesley.... I'm not sure about the last name.... They already know about it." Lawson heard Ford ask A.W. who shot him, and A.W. respond, "Jerry Beesley." She said A.W. said the name three times. Then he said, "Hurry. I can't breathe. Hurry." After a long pause, A.W. said, "I love my kids and I love Donna." A.W. then started convulsing. A.W. was pronounced dead upon arrival at John Peter Smith Hospital. At trial, the court concluded that A.W. was aware of his impending death and admitted the statements as dying declarations and excited utterances. Since appellant admits that all the statements made by the victim except the identification of the appellant are admissible as present sense impressions, excited utterances, or the then existing state of mind of the victim, we need not address the application of those exceptions to hearsay. Tex.R.Civ.Evid. 803.

■ For a victim's statement to be admissible under the dying declaration exception to the hearsay rule, the proponent must show

---

4. In response to appellant's argument that the witness was incompetent because he would not be subject to the penalty of perjury, we note that "[i]f the court wishes to preserve the threat of perjury, the court may compel the witness to acknowledge that he is subject to penalties for perjury." 1 STEVEN GOODE ET AL., GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 603.1 at 524–25 (2d ed. 1993) (citing *Ferguson v. Commissioner of Internal Revenue*, 921 F.2d 588, 590 (5th Cir.1991)). The trial judge had Ford acknowledge that he was subject to the penalties for perjury.

the declarant was unavailable, the statement was made while the declarant believed his death was imminent, and the statement concerned the cause or circumstances of what he believed to be his impending death. TEX. R.CRIM.EVID. 804(b)(2); *Pritchett v. State,* 874 S.W.2d 168, 176 (Tex.App.—Houston [14th Dist.] 1994, pet. ref'd). The adoption of rule 804(b)(2) of the Texas Rules of Criminal Evidence reduced the burden on the proponent in that there is no longer a requirement that A.W. have "no hope for recovery." *Burks v. State,* 876 S.W.2d 877, 901 (Tex. Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995) (citing 33 STEVEN GOODE ET. AL, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 804.4 at 612 (1988)).

■ Appellant does not argue that the predicate for a dying declaration was deficient regarding the cause or the circumstances surrounding the death or the unavailability of A.W.; rather, appellant contends that the State failed to show the statements were made while A.W. believed his death was imminent. While the declaration must be made under a sense of approaching death, it is not necessary that the declarant state in specific terms that he is conscious of his impending death. *Thomas v. State,* 699 S.W.2d 845, 853 (Tex.Crim.App.1985). The requirement that the declarant believed his death was imminent may be inferred from the circumstances of the case such as the nature of the injury, medical opinions stated to the declarant, and the declarant's conduct at the time. *Id.; Hayes v. State,* 740 S.W.2d 887, 889 (Tex.App.—Dallas 1987, no pet.); *Franks v. State,* 625 S.W.2d 820, 822 (Tex. App.—Fort Worth 1981, pet. ref'd).

■ Looking at the circumstances surrounding the statement, there is evidence of the severity of the wound and A.W.'s knowledge of it. A.W. knew that he had been shot in the back, and he was asking for help. He had "blood all over his face and a whole lot of blood on his clothing and shoulder area." A.W. was vomiting blood and blood bubbles. Both witnesses described the large amount of blood A.W. was losing through his mouth. A.W. was unable to roll over on his own and could not move his legs. A.W. repeatedly complained that he could not breathe. Finally, A.W.'s statements that he loved his kids and Donna also support the conclusion that A.W. was aware of his impending death. We believe the statements were properly admitted as dying declarations. The severity of the wound and decedent's statements are sufficient to infer that A.W. was aware of his approaching death. *See Franks,* 625 S.W.2d at 822. Appellant's second point of error is overruled because the trial court did not abuse its discretion by admitting the statements.

## Answering Machine Messages

In point of error three, appellant argues the trial court erred by permitting tape-recorded statements of Nancy, appellant's common law wife, to be admitted at trial. The State offered seven different messages left on A.W.'s answering machine, identified as excerpts one through seven. Appellant objected to all seven excerpts at trial. The trial judge listened to the tape and, based on identification of the voice as that of appellant, admitted excerpts one, three, four, and six. Appellant does not appeal the admission of these four excerpts.

The other three messages, excerpts two, five, and seven, were identified as Nancy's voice. Of these three messages, excerpts two and five include a background voice that was identified as appellant's and were admitted into evidence. The trial judge excluded excerpt seven, which did not have appellant's voice in the background. The trial judge admitted excerpts two and five based on article 19.06 of the Texas Penal Code [5] and also found that while the tapes were prejudi-

---

5. Section 19.06 of the Texas Penal Code was recodified, without substantive revisions, as Article 38.36 of the Texas Code of Criminal Procedure as part of the "Penal Code cleanup." Texas

District & County Attorneys Association, interp. commentary, TEX.CODE CRIM.PROC.ANN. art. 38.36 (1994). Article 38.36 pertains to evidence in prosecutions for murder and provides:

cial, their probative value was not substantially outweighed by the danger of unfair prejudice. Appellant appeals only the admission of excerpts two and five.[6]

The transcription of excerpt two reads:

A.W. he means it and he (mumbles) and they had to get me out of jail for carrying a gun not too long ago, and, uh, (voice in the background) yeah cause, uh, I wasn't real happy with the way things have been, and nothin' is gonna happen to my baby and it sure ain't gonna go hungry or without diapers because you won't pay us. And when he does do what he says he's gonna do, because you wouldn't listen, I'm gonna sit there and watch and laugh and sell fuckin' popcorn and tickets.

The transcription of excerpt five reads:

Now there's nothin' on it ... Hey, listen, are you listenin'? (voice in the background) Take that dick out of your mouth and listen to us, okay. Heh, heh. (voice in the background) And play with it. Heh, heh, heh, heh. I don't care about none of your sob stories. I tried to make a deal with you where you'd pay us five dollars ... two dollars a week ... try to make any kind of amends and you can't do it. You can't do it because you're ... yeah, I expect you to keep your bills off where you pay your help. Yeah, if I was gonna go in business for myself I would make sure my help was paid before I was paid, or else I would not try to run a business. Apparently you're not doin' too damn good or all your crews wouldn't ... you wouldn't get fired and all and you wouldn't owe all your crews money. You don't just owe us money, we know of two or three people you owe money to.

■ On appeal, appellant argues the evidence was not relevant under article 38.36

and was inadmissible character evidence introduced to show appellant's "dangerous character." [7] The first hurdle a proponent of evidence must cross to get the evidence admitted is relevancy. *See Montgomery*, 810 S.W.2d at 375. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R.CRIM.EVID. 401. "Relevancy is not an inherent characteristic of any item of evidence but exists as a relation between an item of evidence and a matter properly provable in the case." *Montgomery*, 810 S.W.2d at 375 (quoting Advisory Committee's Note to Federal Rules of Evidence).

■ Article 38.36 does not allow a showing of the relationship between the deceased and third parties, but it does allow the showing of the relationship between the accused and the deceased. *Jernigan v. State*, 585 S.W.2d 701, 704 (Tex.Crim.App. [Panel Op.] 1979) (citing *Jackson v. State*, 552 S.W.2d 798, 802–03 (Tex.Crim.App.1976), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 799 (1978)).

■ Appellant relies on *Williams v. State*, 768 S.W.2d 337 (Tex.App.—Houston [14th Dist.] 1989, pet. ref'd) to argue the excerpts of calls made by Nancy in which appellant participated were "not relevant to nor probative of the Appellant's state of mind nor part of the prior existing relationship of the parties hereto." In *Williams*, Williams had been convicted of murdering Michael Landow ("Landow"). *Id.* at 338. At trial, Williams tried to admit evidence that Landow had threatened another with a gun. *Id.* at 339–40.

(a) In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense. TEX.CODE CRIM.PROC.ANN. art. 38.36(a) (Vernon Supp.1995).

6. We note that we have reviewed the tape in this case. In excerpts two and five, there is a male voice in the background that was identified at trial as the voice of appellant.

7. Although appellant objected on hearsay grounds at trial, appellant has not raised the hearsay challenge on appeal.

Williams's theory for admitting the threat was that it showed the condition of appellant's mind at the time of the offense and was, therefore, admissible. *Id.* at 340. The trial court excluded the evidence. In affirming the trial court's decision, the appellate court concluded that evidence of a threat made by the deceased to a third person out of Williams's presence was irrelevant. *Id.* at 341.

This case is distinguishable from the scenario presented to the court in *Williams*. This case does not involve threats by A.W. to a third party; rather, this case involves threats made to A.W. in which appellant participated.[8] Appellant's voice in the background of the tapes shows appellant's involvement in the threats against A.W.[9]

While appellant is correct that article 38.36 does not allow a showing of the relationship between the deceased and third parties, *see Jernigan*, 585 S.W.2d at 701; *Jackson*, 552 S.W.2d at 798, we do not find the situation presented to the trial court was one involving the relationship between a third party and the deceased. Based on our review of the evidence, we believe a reasonable person, with some experience in the real world, would believe that the excerpts were helpful in determining the truth or falsity of appellant's alleged motive in committing the crime. *See Montgomery*, 810 S.W.2d at 376. The calls support the theory that appellant was angry with A.W. because A.W. had not paid him for a construction job. Therefore, we cannot say the trial court abused its discretion by determining that the two messages in question were relevant.

■■■ Examining appellant's character evidence argument, we are unpersuaded that the excerpts in question were inadmissible character evidence. Rule 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

TEX.R.CRIM.EVID. 404(b). Even if Nancy's calls with appellant participating are viewed as wrongs or acts showing appellant's "dangerous character," the content of the calls brings them within the recognized motive exception to the ban on character evidence. *See id.*

■■■ Although motive is not an essential element of the crime of murder, evidence of motive is always admissible because "it is relevant as a circumstance tending to prove the commission of an offense." *Bush v. State*, 628 S.W.2d 441, 444 (Tex.Crim.App. 1982); *see Miranda v. State*, 813 S.W.2d 724, 742 (Tex.App.—San Antonio 1991, pet. ref'd). For evidence to be admissible as proof of motive, it must tend to raise an inference that the accused had a motive to commit the alleged offense for which he is on trial. *Bush*, 628 S.W.2d at 444. "Evidence of prior extraneous offenses committed by the accused against the victim of the offense charged that show ill will or hostility toward the victim 'is admissible as part of the State's case in chief as circumstantial evidence of the existence of a motive for committing the offense charged.'" *Page v. State*, 819 S.W.2d 883, 887 (Tex.App.—Houston [14th Dist.] 1991, pet. ref'd) (quoting *Foy v. State*, 593 S.W.2d 707, 709 (Tex.Crim.App. [Panel Op.] 1980)).

The facts in this case are similar to *Bevers v. State*, 811 S.W.2d 657 (Tex.App.—Fort Worth 1991, pet. ref'd), where we affirmed

8. Further, a reading of the facts in *Williams* actually supports admitting the evidence in this case. Evidence of "bad blood" between the appellant and the decedent was admitted in *Williams*. The trial court admitted evidence that Landow had accused appellant of stealing his dog, his dress suits, and his girlfriend; appellant and Landow had argued numerous times about the "stolen" dog; Landow had threaten to shoot appellant, and appellant swore "on his mother's grave to kill [Landow]." *Id.* at 339.

9. As the trial court explained, the calls in question made by Nancy in which appellant is heard in the background shows a "close agency relationship."

the trial court's decision to admit evidence of a prior rape conviction in a subsequent rape prosecution. In *Bevers*, the victim of the prior rape offense was also the victim of the rape offense for which appellant was on trial. *Id.* at 662. The victim testified at the second trial that prior to reporting the rape in the first offense, the appellant threatened to punish her if she reported the original offense. *Id.* This court held the prior conviction was admissible in the second trial because the victim's report leading to the first conviction coupled with the appellant's threat to her tended to establish a motive for the second rape. *Id.*

The Texas Court of Criminal Appeals addressed a similar situation in *Foy*, 593 S.W.2d at 707. In *Foy*, the appellant was convicted of arson for throwing a "Molotov cocktail" into the victim's home. *Id.* at 708. The victim was allowed to testify at trial about two other incidents involving threats against her made by appellant. First, the victim testified that appellant, three weeks before the Molotov cocktail incident, "pointed a pistol" at her when she was leaving a shopping center. *Id.* Second, the victim testified that appellant came to her home about two weeks before the Molotov cocktail incident and pointed a gun at her while threatening her. *Id.* The Texas Court of Criminal Appeals held that the testimony regarding the prior bad acts of the appellant was admissible because the evidence of ill will was "circumstantial evidence of the existence of a motive" for committing the offense charged. *Id.* at 709.

We conclude that the evidence of prior acts committed by appellant against A.W., his participation in the threatening phone calls to A.W. made by Nancy, show appellant's ill will or hostility toward A.W. *See Page*, 819 S.W.2d at 887. Therefore, the excerpts from the tape were admissible as circumstantial evidence of the existence of a motive for appellant to commit the offense charged.

*See Bush*, 628 S.W.2d at 444. Because we cannot say the trial court abused its discretion by finding the evidence was admissible under article 38.36 and was relevant to show appellant's motive for murdering A.W., we overrule appellant's third point of error.

## Punishment Phase Testimony

In point of error four, appellant argues the trial court erred by refusing to allow appellant to testify that he was not the person who shot A.W. Appellant argues that his "willingness or unwillingness to accept responsibility for his acts" is relevant evidence pertinent to sentencing. TEX.CODE CRIM.PROC. ANN. art. 37.07, § 3 (Vernon Supp.1995). Appellant wanted "to tell the jury that he had been pressured into covering up for another person." Appellant did not attempt to introduce this evidence during the guilt/innocence phase of trial.

At the trial on punishment, appellant took the stand. The defense attorney, with the qualification that he had been "ordered" by his client to ask the question, asked appellant "is there something that you wanted to tell the jury about what they should know about you before they set your punishment?" Appellant began to go into matters that had been brought before the judge during an *ex parte* hearing at the guilt/innocence trial. Essentially, appellant had informed the judge at the *ex parte* hearing and sought to inform the jury at punishment that he had witnessed the murder and had been pressured by the "real murderer," Robert Scruggs, into signing a false statement to the police denying knowledge of the crime. The State objected to any further testimony along these lines on the ground that it was improper to relitigate appellant's guilt or innocence at the trial on punishment under article 37.07, section 3(a). The court sustained the State's objection.[10]

At the penalty stage of trial, both the State and the defendant may offer evi-

---

10. Although the State argues that appellant failed to preserve this issue for appeal, we cannot agree. First, the State was the party that objected to the admission of the evidence. Therefore,

once the State's objection was sustained, appellant had an adverse ruling. Second, we do not find the doctrine of invited error is applicable in this case. Although appellant's attorney at trial,

dence "as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried." TEX.CODE CRIM.PROC.ANN. art. 37.07, § 3(a) (Vernon Supp.1995). Exonerating evidence or evidence supporting affirmative defenses, however, is not admissible at the penalty phase because it is not relevant to the jury's assessment of punishment even though the same evidence would have been relevant had it been offered at guilt/innocence. *Nixon v. State,* 572 S.W.2d 699, 701 (Tex.Crim.App. [Panel Op.] 1978); *White v. State,* 444 S.W.2d 921, 923 (Tex.Crim.App. 1969); *see also Brazile v. State,* 497 S.W.2d 302, 304 (Tex.Crim.App.1973) (Morrison J., concurring); *Saunders v. State,* 687 S.W.2d 60, 64 (Tex.App.—Dallas 1985, pet. ref'd) (Guillot J., dissenting).

 Although appellant characterizes the proffered evidence as mitigating, our review of the record reveals that his version of the events is not evidence of a mitigating factor

to consider during punishment; rather, appellant's evidence is evidence that he should be found "not guilty of murder." Appellant failed to offer his version of the events when the jury was determining appellant's guilt, and the jury had already found him guilty by the time appellant tried to introduce his version of the events. Appellant's fourth point of error is overruled because the trial judge properly excluded appellant's irrelevant testimony at the trial on punishment.

Accordingly, the judgment of the trial court is affirmed.

---

who is also appellant's attorney on appeal, admitted that he was "not aware of any case in this state that allows you to go back and relitigate the question of guilt/innocence," we do not believe a truthful statement to the judge indicating one is unaware of any case directly on point waives error under the invited error doctrine.