**Opinion issued August 20, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————————

## NO. 01-11-00906-CR

————————————————

**HERBERT FOSTER NASH, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

---

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case No. 1253919**

---

## MEMORANDUM OPINION

A jury found appellant, Herbert Foster Nash, guilty of the offense of capital

murder,[1] and the trial court assessed his punishment at confinement for life.  In two

---

[1]    *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2011).

issues, appellant contends that the trial court erred in "allowing a witness to testify without swearing or affirming to tell the truth" and submitting a charge to the jury without a limiting instruction regarding extraneous-offense evidence admitted at trial.

### Background

Roy Brewer testified that around 8:00 a.m. on June 3, 2009, he stopped, as he sometimes did, at a convenience store on his way to work and saw the store owner, Muhammad Zubair, a man he knew as "Mike," talking on the telephone. Brewer did not immediately notice that anything was wrong, retrieved an item to purchase, and approached the cash register. He then heard Mike "hollering for help" on the telephone. Because he had left his cellular telephone in his truck, Brewer went outside looking for help. When he went back inside the store, he saw Mike fall, but then get back up and continue to ask for help on the telephone. Brewer then went back outside, waited for help, and spoke to police officers after they arrived.

Houston Police Department ("HPD") Officer A. Taravella, assigned to the Identification Division Crime Scene Unit, testified that he was dispatched to the convenience store at 9:18 a.m. after receiving notice of a double homicide there. Taravella took photographs and a video of the crime scene, where he saw loose cash behind the counter and a dust-covered Glock .9 millimeter handgun

2

immediately below the cash register. He noted that there was over $500 in the cash register, which appeared undisturbed, and $3,300 cash, partially bundled and partially in a cigar box. On the counter near the cash register, Taravella collected four fired cartridge casings from a .380 semiautomatic handgun. Taravella explained that he also tested for fingerprints and DNA on the glass doors, handles, crossbars and the countertop.

HPD Investigator D. Arnold, who works primarily as a "follow up investigator" in the homicide division, testified that he was dispatched to the crime scene. He learned that two men had been shot in what appeared to have been a "robbery that had turned into a homicide," and one died at the scene and the other at a hospital. After canvassing for witnesses and surveillance cameras at nearby businesses, Arnold found surveillance cameras at a coffee plant which was across the street from the convenience store, and a nearby wholesale food company. Based on a witness description and "Mike's" telephone call for emergency assistance, he began looking for at least one young, black male suspect. In investigating whether any similar robberies had taken place in the area, Arnold learned that another robbery had occurred at the same convenience store twelve days earlier on May 22, 2009. When he viewed surveillance video from the coffee plant taken on May 22, 2009, he saw a "long green sedan vehicle" which looked like a Cadillac, parked next to the convenience store. From the surveillance

3

camera at the wholesale food company, Arnold found photographs of a white car, which was parked next to the convenience store. He later learned that the photographs were relevant to the June 3, 2009 robbery and homicide. In November 2009, HPD received from Crime Stoppers an anonymous tip, which led Arnold to Minh Truong, a man with the street name "Chino." Arnold interviewed Truong, who cooperated and admitted to his involvement in the June 3, 2009 robbery and homicide. After obtaining a statement from Truong, Arnold realized the significance of the green car, which was parked next to the convenience store on May 22, 2009, and the white car, which was there on June 3, 2009. Truong told him where to find the green Cadillac, and Arnold asked HPD Officer R. Chappel to locate and photograph the car. The green Cadillac that Chappel found at appellant's residence was the same green Cadillac seen in the surveillance video of May 22, 2009, and it was registered to appellant's mother. Arnold explained that a jail inmate, Jessie Patterson, had information about the crime. Arnold then took a statement from Patterson and later forwarded his information to the district attorney's office.

Harris County Deputy Constable M. Leal testified that he had provided information to HPD that the convenience store had been robbed on May 22, 2009 and he was dispatched to it in response to a "robbery in progress" call. The store clerk, Shazad Qureshi, described the robbers as a Hispanic male wearing a bandana

4

and a black male wearing a ski mask. The robbers, who used a small caliber handgun, were able to take some money. Leal saw that there was easy access to the money behind the counter, and he advised Qureshi to use the drop box to secure it.

Minh Truong testified that he was then in jail, charged with the murder of the two convenience store clerks, Mohammad "Mike" Zubair and Shadzad Qureshi, and he had pleaded guilty to the offense of aggravated robbery. Truong admitted committing the robbery and explained that he had agreed to testify against appellant with the agreement that his possible sentence would be capped at confinement for forty-five years. He explained that although he is Hispanic, he was adopted by a Vietnamese family and given a Vietnamese name. When Truong met appellant who lived in the same townhouse as Truong's girlfriend and their daughter, he and appellant would smoke and drink together; sometimes they would ride around in appellant's car, a dark green Cadillac Fleetwood.

In 2009, Truong was homeless and no longer working, and appellant was laid off from his job, so the two started to talk about how to make some money. Eventually, appellant told Truong that he knew of a "little lick that [they] could hit," which was a little corner store they could rob. Appellant and Truong planned that they would each receive an "even cut" of the money, which appellant knew was kept in a cabinet under the cash register. Appellant stated that they would not

5

wear masks because it would immediately alert the clerks to the robbery. Truong noted that appellant had told him that he had been involved in a previous attempt to rob the same store, but when he and his partner went in wearing masks, the clerk got scared, and they ran out without any money. Because his car, the dark green Cadillac Fleetwood, was so distinctive, appellant borrowed a white Crown Victoria and a gun to use in the robbery.

Truong further testified that on June 3, 2009, appellant picked him up in the white Crown Victoria and showed him the gun wrapped in a white cloth in the glove compartment. Appellant and Truong then picked up two other men, one known as "Fooey," and the other a teenager named Casey, who went by the nickname "Youngster." Fooey drove the car because he believed that he would be a fast get-away driver, appellant sat in the front passenger seat, and Truong and Youngster sat in the backseat. Truong explained that appellant was "in charge" and told everyone what they were supposed to do. When they arrived at the store, appellant told Truong to go around the counter and get the money while Youngster held the clerks down. Troung walked into the store and pretended to shop. Youngster came in, went to another area of the store, and then pulled out the gun and went up to the counter, yelling at the clerk not to move. The clerk tried to get the gun from Youngster, they struggled for the gun, and Youngster then shot the clerk three times. Youngster then tried to get behind the counter for the money,

6

but Truong started yelling for them to get out of the store, and he ran for the door. Truong saw the other store clerk reaching for something behind the counter, and he thought that the man had a gun in his hand, so he warned Youngster. Youngster then shot at the other clerk as he was running out the door after Truong. Appellant and Fooey had heard the gunshots, and Truong and Youngster told them what had happened as they drove away. Truong explained that appellant was angry with them for not getting the money after Youngster had shot the clerks, and he told them that they should have just moved the body out of the way and grabbed it.

Jessie James Patterson testified that he was in jail in December 2009 for forgery of counterfeit money, a charge that was eventually dismissed, when he was housed with appellant. Patterson and appellant talked about the robbery at the convenience store and the two store clerks who were killed. Appellant showed Patterson a newspaper article about the robbery and killings, and he told Patterson that two men had gone into the store and killed the clerks. He expressed anger at the two men because they were not supposed to kill anyone. Appellant told Patterson that he had sold his green Cadillac because police officers suspected that it had been involved in a crime and had come by his house to look at the car while he was in jail. Appellant explained that he had gone to the convenience store several times, "scoping it for a robbery," using his green Cadillac. Appellant told Patterson that he was in the car, but not "at the scene" and he had slapped one of

the men for killing the store clerks because they were not supposed to kill anyone. And appellant expressed concern that one of the store clerks had not died immediately.

**Witness Testimony**

In his first issue, appellant argues that the trial court erred in admitting the testimony of Patterson because he "could not understand the oath," "did not properly take it," "never equivocally stated that he would tell the truth," and "never made a serious public commitment to answer truthfully." Appellant further argues that the error was harmful "because the unsworn witness provided testimony necessary for the [S]tate to meet its burden." Appellant expressly disclaims in his brief that he is asserting that Patterson was incompetent to testify due to mental illness. *See* TEX. R. EVID. 601(a)(1).

The record reflects that Patterson was actually sworn in as a witness, although the oath itself was not recited into the record. The following exchange then took place:

[THE COURT]: Pardon me?

[PATTERSON]: I don't know. I'm confused about all this right here.

[THE COURT]: Any testimony you give in this court will it be the truth?

[PATTERSON]: I'm going to try to tell the truth. I don't believe that man killed nobody. That's all I can say.

8

[THE COURT]: Any testimony –

[PATTERSON]: Okay.

[THE COURT]: Any testimony you give in this court will it be the truth, the whole truth?

[PATTERSON]: To the best of my knowledge I'm going to try to tell the truth.

[THE COURT]: That's all we ask. The whole truth and nothing but the truth?

[PATTERSON]: I'm kind of confused.

Later, after several minutes of questioning by the State, Patterson again expressed confusion:

[STATE]: What did I ask you to do when you came into the courtroom today?

[PATTERSON]: Tell—to say what I remember, but I don't remember it that well.

[STATE]: What did I ask you to tell?

[PATTERSON]: The truth.

[STATE]: Have I ever told you to tell anything other than the truth?

[PATTERSON]: No.

[STATE]: Are you prepared to do that today, Mr. Patterson?

[PATTERSON]: No, I'm not because I don't—by me being a mental patient I really don't know too much about this kind of stuff. I was doing—I was under

9

> duress.  I thought I was going to get into trouble if I didn't and be locked up.

> [STATE]:         So you're telling this Court you're not prepared to tell the truth today?

> [PATTERSON]:   No.

The court then determined that Patterson should be appointed counsel.  After a recess to allow Patterson to consult with his attorney, the State's examination resumed as follows:

> [STATE]:         Mr. Patterson, have you had an opportunity to think about your situation here this morning?

> [PATTERSON]:         Yes.

> [STATE]:         And have you decided whether or not you're going to tell the members of the jury the truth?

> [PATTERSON]:         Yes, to the best of my knowledge.

> [STATE]:         You prepared to go forward and do that now?

> [PATTERSON]:         Yes.

Patterson proceeded to testify regarding the conversations that he had with appellant while they were housed together in jail.  The State argues that appellant waived any error by not objecting to Patterson's testimony as unsworn.  When the trial court determined that Patterson should be appointed counsel and asked for appellant's position on the matter, defense counsel stated, "I'm not sure he's

10

qualified to be a witness yet." After Patterson consulted with his attorney and stated that he was going to tell the truth "to the best of [his] knowledge" and he was prepared "go forward and do that now," appellant made no objection to Patterson's qualification as a witness. The Texas Court of Criminal Appeals has held that failure to raise an objection to allegedly unsworn testimony at the time the testimony is offered waives the error. *See Beck v. State*, 719 S.W.2d 205, 211 (Tex. Crim. App. 1986). A defendant waives the right to have a witness sworn by failing to object to unsworn testimony before the close of the trial. *Id.*; *see also Castillo v. State*, 739 S.W.2d 280, 297 (Tex. Crim. App. 1987) (holding that an objection made after verdict is too late).

Before testifying, every witness must "declare" that he "will testify truthfully, by oath or affirmation administered in a form calculated to awaken" his "conscience and impress" his "mind with the duty to do so." TEX. R. EVID. 603. The record reflects that Patterson was sworn in as a witness, but when he expressed confusion and stated that he was not prepared to tell the truth, the trial court appointed Patterson counsel and recessed the proceedings so that Patterson could confer with his counsel. Afterward, Patterson affirmatively stated that he would tell the truth "to the best of [his] knowledge" and he was "prepared to do that." *See Bisby v. State*, 907 S.W.2d 949 (Tex. App.—Fort Worth 1995, pet. ref'd). Patterson expressed his desire to tell the truth throughout his testimony and stated

11

that he was "scared" and did "not want to be caught in no lie," because he knew that the consequences were that he could be jailed. Throughout his testimony, Patterson expressed concern about the consequences of lying and possibly contradicting his prior statements made to a grand jury. His expressed concerns indicate that he understood the oath. *See id.* Patterson affirmatively stated that he would tell the truth, and his testimony shows that the oath administered sufficiently awoke his conscience and impressed upon his mind the duty to tell the truth to qualify him as a witness. *See* TEX. R. EVID. 603.

We overrule appellant's first issue.

### Jury Charge

In his second issue, appellant argues that the trial court erred in not providing the jury with a limiting instruction regarding extraneous offenses because the May 22, 2009 robbery of the convenience store was an extraneous offense. "[W]hen evidence of collateral crimes is introduced for one of the various purposes for which such evidence becomes admissible, the jury should be instructed that they cannot consider against the defendant such collateral crimes, unless it has been shown to their satisfaction that the accused is guilty thereof." *Ex parte Varelas*, 45 S.W.3d 627, 631 (Tex. Crim. App. 2001) (quoting *Lankford v. State*, 93 Tex. Crim. 442, 248 S.W. 389, 389 (1923)). Thus, upon request, a trial court should instruct a jury that they are not to consider extraneous-act evidence

12

unless they believe beyond a reasonable doubt that the defendant committed the act. *Id.*; *see also Mitchell v. State*, 931 S.W.2d 950, 954 (Tex. Crim. App. 1996) ("If a defendant, during the guilt/innocence phase, asks for an instruction to the jury on the standard of proof required for admitting extraneous offenses, the defendant is entitled to that instruction."). Similarly, the trial court should also, upon demand, instruct the jurors that they may consider the extraneous offense only for the limited purposes for which it was admitted. *Ex parte Varelas*, 45 S.W.3d at 631, 634.

The clerk's record filed with this appeal contained an incomplete copy of the jury charge and was missing the page containing the limiting instruction on the extraneous offense. The State requested that the district clerk file a supplemental record with a complete copy of the jury charge, including the missing page. The missing page, now a part of the appellate record, contains the following language:

> You are further instructed that if there is any evidence before you in this case regarding the defendant's committing an alleged offense or offenses other than the offense alleged against him in the indictment in his case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense or offenses, if any and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose.

A defendant is entitled to such a limiting instruction on the use of evidence of extraneous offenses during the guilt phase of trial only if he has timely requested

the instruction at the time the evidence is first introduced.  *See Delgado v. State*, 235 S.W.3d 244, 253 (Tex. Crim. App. 2007).  Although the record does not reflect that appellant specifically asked for a limiting instruction when the complained of evidence was introduced, he did object during a pretrial hearing and continually during the trial, and the trial court gave the instruction to the jury when appellant requested it at the charge conference.  Thus, the trial court properly instructed the jury that it could consider the extraneous-offense evidence only if it believed, beyond a reasonable doubt, that appellant had committed the offense, and only in determining the "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" of appellant.  *See Varelas*, 45 S.W.3d at 631; TEX. R. EVID. 404(b).

We overrule appellant's second issue.

### Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Do not publish.   TEX. R. APP. P. 47.2(b).

14