Lanny Gene BEVERS, Jr., Appellant,

v.

The STATE of Texas, State.

No. 2–89–302–CR.

Court of Appeals of Texas,
Fort Worth.

May 31, 1991.

Discretionary Review Refused
Oct. 2, 1991.

Donald S. Gandy, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., and David K. Chapman, Asst. Dist. Atty., for appellee.

Before JOE SPURLOCK, II, FARRIS and DAY, JJ.

## OPINION

JOE SPURLOCK, II, Justice.

On November 9, 1989, appellant, Lanny Gene Bevers Jr., was found guilty of aggravated sexual assault plus one felony enhancement and was sentenced to life in the state penitentiary plus a $10,000 fine. TEX.PENAL CODE ANN. sec. 22.021 (Vernon 1989) and TEX.PENAL CODE ANN. sec. 12.42(c) (Vernon Supp.1991).

Appellant pled "not guilty" in a trial to a jury. The court assessed punishment and ordered that the sentence not commence until the judgment and sentences on two prior convictions, one for aggravated sexual assault, and the other for retaliation (TEX.PENAL CODE ANN. sec. 36.06 (Vernon Supp.1991)), both ceased to operate.

Appellant complains in six points on appeal that the trial court erred in admitting evidence of a prior conviction for aggravated sexual assault of the same victim occurring seven years before the assault for which he was on trial. In a seventh point, he argues that the trial court erred in admitting evidence that he had made threatening phone calls to the victim following the present assault. In his eighth and ninth points, he contends that the trial court erred in failing to dismiss the indictment in this matter. He argues an impermissible delay in presentment of the indict-

ment operated to deprive him of his constitutional rights to due process.

We disagree with all nine points on appeal and affirm the judgment of the trial court.

Appellant's points all relate to either the admission of extraneous offenses or to the constitutionality of the State's delay in prosecution. Appellant does not challenge the factual basis of this prosecution.

The complainant in this case was awakened from deep sleep by a loud noise—a man had kicked in her bedroom door sometime after 2:58 a.m. on September 8, 1984. The intruder was wearing a stocking mask and was armed with both a knife and a gun.

The masked intruder leaped at the complainant and grabbed her as she tried to get away. In what the complainant later described as a gruff, crackling voice the man told her not to scream, to shut up and to roll over on her stomach. She complied with his commands as he then threatened to shoot her in the head. He then hit her twice in the head with his gun, causing blood to gush into her eyes.

The complainant struggled to get free of her assailant, who by now was on top of her holding her down in a vise grip. As the intruder held the victim's right hand behind her back, he forced the knife through her wrist and worked the blade back and forth severing the woman's right thumb in a manner she described as if he were boning a chicken. She only later realized that her thumb had actually been cut off when, momentarily escaping her attacker and running to the kitchen, she discovered she could not turn a door knob with her right hand. As she managed to open the door with her left hand, though she was right handed, her attacker pulled her back into the kitchen and the two fell to the floor.

The assailant then asked the complainant her name. When she replied, inventing the name "Sally," he said, "No, you're not Sally," and then called her by her true first name.[1] When he asked about her daugh-

---

1. The victim's actual first name, the name her attacker called her, is the name she went by when she testified against appellant in his trial for the 1977 extraneous offense. However, the

ter, the complainant falsely told him she was staying with friends.

The assailant wanted the complainant to clean the blood off herself, so he pulled her by her hair to the bathroom, posed her in front of the mirror, shoved his gun under her chin so hard that he bruised her deeply, and began to shake and quiver as he instructed the woman to look at herself, not at him. He then ordered her into the bathtub to clean up. He repeatedly forced her right hand under water, even though this increased the bleeding.

After threatening to kill the complainant, the man wandered toward her daughter's bedroom door, in view of the bathroom. He partially opened the door several times, then closed it, causing the complainant to fear for her daughter's life.

The complainant pretended to faint, then tried again to get out of the house and away from her attacker. She ran to the front door but the assailant reached her before she could get out. She then ran to her bedroom to try to use the telephone, but the line was dead. She later learned that her assailant had removed the kitchen phone extension from its hook. Her unlisted telephone number was visible on both extensions. That fact became significant when evidence of threatening phone calls made by appellant to the victim months after the attack was introduced.

During her attempts to escape her attacker she noticed a cigarette lighter on the floor and thought it odd; it had not been there before and no one in her family was a smoker.

The complainant continued trying to escape, despite her assailant's efforts to get her back into the bathtub. She ran through the living room and hall and to the door to the garage in the kitchen where her assailant slammed the kitchen door into her leg, breaking it in two places. She collapsed on the floor and awoke to find him hitting the kitchen table with a large knife.

The man then sexually assaulted the complainant. The particular facts of the assault are significant since one purpose for the trial court's admission of evidence of the earlier rape conviction was to show the identity of the attacker by showing the similarity of the two crimes. He first inserted two fingers into her vagina, then forced his limp penis into her vagina. Next, he forced his penis into her anus and then her mouth. Finally he performed oral sex on her. At no time did he ejaculate.

The rapist then jerked the complainant up by her hair, urging her to walk on her broken leg. She kept falling and he kept pulling her up. Though the woman could not walk, the rapist ordered her back to the bathtub to clean up again. Prodded by her attacker, the woman managed to pull herself back into the tub.

While she was in the tub, he went back to the door of her daughter's room and again opened and closed the door several times. The rapist then took towels from a linen closet and, wiping the floor in a broad circular pattern, attempted to clean the spilled blood from the bathroom and hallway.

As the rapist cleaned, the complainant managed to get out of the bathtub and crawled all the way to the garage before he caught her in front of her car. The assailant then threw her onto a pile of bags in the garage and began wiping up the garage floor as he had tried to clean the bathroom. The complainant managed to crawl out through the slightly open garage door and slowly make her escape to the nearby home of her neighbors. They called the police at approximately 5:22 a.m.

Testimony established that the cigarette lighter found on the floor of the complainant's bedroom contained fingerprints identified as appellant's.

In his first five points on appeal appellant argues that evidence of his 1977 conviction for rape of the same victim should not have been admitted. He complains that admission of the evidence impermissi-

victim was, by the time of this attack, uniformly known to all friends and acquaintances by her

middle name.

bly bolstered the testimony of the victim as to identification of the appellant, that the evidence should have been excluded because the probative value of the evidence was outweighed by its prejudicial effect, that the admission of the evidence deprived appellant of his state and federal constitutional rights to due process, and that the admission invaded the province of the jury.

■ The victim never identified the appellant as her attacker. The identity of the rapist was established through circumstantial evidence, part of which was the evidence that he had previously raped the same victim in a similar manner. The first point on appeal, in which appellant claims that the extraneous offense impermissibly bolstered the victim's identification of the appellant, is without merit.

It is arguable that admission of appellant's prior conviction for rape served to bolster the victim's identification of him as her attacker in 1977. However, as discussed in connection with other points on appeal, the fact that appellant had already been incarcerated for raping the same victim seven years earlier provided his motive for the second crime.

Obviously the admission of evidence that an accused being tried for a brutal rape had already been convicted of aggravated sexual assault of the same victim is highly prejudicial. *See* TEX.R.CRIM.EVID. 403. Rule 403 allows exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice.

The general rule is that extraneous offenses are inadmissible unless the purpose of admission falls within a few recognized exceptions. *Kelley v. State,* 677 S.W.2d 34 (Tex.Crim.App.1984). The exceptions to the general rule are enumerated under TEX.R.CRIM.EVID. 404(b). According to rule 404(b), evidence of prior convictions

may not be admitted to show character, but may be admitted to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ As appellant notes, the purpose for allowing evidence of extraneous offenses for purposes of showing identity is to allow the State to show that certain distinguishing features are shared between the extraneous offense and the present offense. The distinguishing feature should be of such a unique character that if the extraneous offense were committed by the accused then the present one probably was as well. Both crimes, in other words, bear the unique signature of one offender. *See e.g., Russell v. State,* 665 S.W.2d 771 (Tex.Crim. App.1983).

■ Appellant concedes that the State is entitled to attempt to show similarities between the present offense and other extraneous offenses.[2] The main thrust of appellant's argument on his first five points is not directed at the admission of evidence of an extraneous offense so much as at the admission of evidence of appellant's conviction for that offense. He argues that while the *actions* which constituted the offense were themselves admissible, the admission of the *conviction* was highly prejudicial since it had the predictable effect of signaling to the jury that the same victim who now testified that the appellant had brutally raped and mutilated her had seven years earlier told a similar story to a different jury. That jury believed her and the appellant had been convicted, appealed that conviction and had his conviction affirmed on appeal. Appellant believes that this signal to the jury worked to invade the province of the jury and to deprive him of constitutional rights to due process. U.S. CONST. amends. V, VI, XIV and TEX. CONST. art. 1, sec. 19.

---

**2.** The State contends that it indeed succeeded in showing the requisite similarities since the victim testified that during the earlier rape, her attacker, the appellant, had entered through the same door, severely cut her hand and then tried to make her clean the blood by holding her hand under water, that he got towels from the same closet and wiped the floor in the same circular motions as did the attacker in the second rape. The rapes themselves followed a similar pattern as the appellant, in committing the first rape, inserted two fingers into the victim's vagina, before penetrating her vagina with his flaccid penis. At no time during the first rape did the appellant ejaculate, just as in the second rape.

We disagree. Rarely would it be more prejudicial to an accused to reveal to the jury that he had already been found guilty of committing various criminal acts than merely to reveal that he had committed those same acts. Appellant's argument only acquires what force it has because the victim of both crimes is the same person. Appellant reasons that if she was believed the first time she is more believable the second time. If there is any sense to that reasoning, it breaks down with respect to the particular facts of this case. The complainant here never identified appellant as her attacker. Her testimony concerning the rape dealt exclusively with the violence visited upon her and not with her attacker. That testimony did not require bolstering to be believed by the jury.

Were there any question whether evidence of appellant's prior conviction were admissible appellant's counsel himself made the argument for admission stronger by his own trial tactics. On cross-examination, following the complainant's revelation of the earlier crime, counsel for appellant attempted to impeach the complainant by questioning her on variances between her present testimony and her testimony during the trial on the previous rape many years earlier.[3] If no suggestion of the appellant's having been found guilty of the first rape were allowed before the jury, it could easily be led to believe that the complainant was wrong about the person who raped her in 1977. Since the validity of the former conviction is not questioned, it would be ludicrous to allow a later jury to question the final conviction and judgment of a different court in another case.

■ There is another reason for allowing admission of the former conviction. It provides a motive for the second offense. TEX.R.CRIM.EVID. 404(b). At this trial the victim even testified that during the first rape the appellant threatened to return and punish her if she contacted the police. The obvious implication is that he carried through with his threat. *See Foy v. State*, 593 S.W.2d 707, 708–09 (Tex.Crim. App. [Panel Op.] 1980) (prior conviction for crimes against the same victim are admissible to show motive of revenge for the prior incarceration). The fact that appellant was indeed found guilty for the prior offense and then incarcerated for it was necessary to reveal appellant's motive for the attack on the victim in such a brutal, senseless fashion.

We hold that evidence of appellant's prior conviction was admissible because it tended both to establish a pattern and to show a motive for the second rape. Points of error one through five are overruled.

In point of error seven appellant complains that evidence of another extraneous offense was improperly admitted. Following this rape, appellant made a series of phone calls to the complainant. Evidence of those calls was admitted to prove the identity of the rapist.

■ The complainant testified that the police gave her a tape recorder to record the phone calls. Together with the police, she planned to keep the caller on the phone long enough to attempt to get him to return to her house so that the police could apprehend him. The transcripts of the phone calls do not amount to an admission on the part of the caller of being the rapist. Nevertheless, the caller evidenced certain knowledge which the rapist would have had.[4] Further, the victim's daughter answered several of the calls and identified the voice as the same voice she had heard from the man who brutally assaulted her mother.

Evidence put on by the State showed that the phone calls were traced to two sources: (1) the appellant's in-laws and (2) the business for which appellant worked. A district attorney investigator observed appellant making a phone call from appellant's place of employment, the source of many of the calls, at the same time the

---

3. Such questioning, however, was appropriate and failure to have asked those questions would have been less than professional, competent representation.

4. He knew her unlisted phone number. He knew about the victim's thumb. He called her by her first name as had the rapist, not by her middle name, as her friends called her.

victim received one of the threatening calls. Appellant was apprehended shortly thereafter leaving the same building from which the call was made.

Appellant's argument that there was insufficient evidence to tie appellant to the phone calls is without force. While the evidence tying him to that extraneous offense is, for the most part, circumstantial, it is nevertheless compelling.

■ In reviewing the sufficiency of the evidence in either a direct or circumstantial evidence case, we must view the evidence in the light most favorable to the prosecution and consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. State,* 672 S.W.2d 801, 803 (Tex.Crim.App.1984); *Houston v. State,* 663 S.W.2d 455, 456 (Tex.Crim.App.1984) (opinion on reh'g); *Wilson v. State,* 654 S.W.2d 465, 471–72 (Tex.Crim.App.1983) (opinion on reh'g). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). However, a conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the defendant. *Johnson v. State,* 673 S.W.2d 190, 195 (Tex.Crim.App. 1984); *Jackson,* 672 S.W.2d at 803.

As the State argued at the trial, the only other hypothesis supported by the facts, other than that the appellant made the calls, was that they were made by someone else having access both to a phone at appellant's in-laws house and at his work place. That same person must have been at work at the same time as appellant when the last phone call was made. That hypothetical person must also have resembled appellant and been observed by the investigator making the final phone call. That is not a reasonable hypothesis. The only hypothesis supported by the facts is that the appellant made the phone calls.

■ As already discussed, the fact that appellant made the calls certainly served to identify him as the person who committed the aggravated sexual assault as well. Not only was this extraneous offense admissible to show identity, evidence of this extraneous offense was vital to the State's case. Apart from the cigarette lighter, the only evidence directly tying appellant to the crime was the fact that he made the calls and showed knowledge the rapist would have had. The probative value of the extraneous offense therefore outweighed the prejudice to appellant. Appellant's seventh point on appeal is overruled.

■ In his sixth point on appeal, appellant argues that the acts constituting the extraneous offense, the 1977 rape, should not have been admitted. Having already held that the evidence of the conviction was admissible we also hold that the acts constituting the offense were admissible. Appellant, detailing the differences between this crime and the 1977 rape, points out that there must be a "high degree of similarity" between the two crimes to justify admission. *Plante v. State,* 692 S.W.2d 487 (Tex. Crim.App.1985). As already noted, the earlier crime was admissible to show motive as well as identity. Furthermore, there was sufficient similarity between the crimes to permit admission to show identity. *See Jones v. State,* 587 S.W.2d 115, 120 (Tex. Crim.App. [Panel Op.] 1978). In Jones, evidence of a prior rape was held admissible though the accused was on trial for burglary. Both crimes involved an assault of a lone female resident of apartments in the Oak Cliff area of Dallas. In both crimes, the perpetrator attempted to disguise himself and in the burglary, the victim, though not raped, had her clothing torn off as she struggled with an intruder. We have already alluded to the salient similarities between the two crimes in this case. The similarities between the two crimes in this case are, if anything, greater than the similarities between the two crimes in *Jones.* Further, in *Jones,* the evidence of the extraneous offense was offered before the accused brought identity into question by raising an alibi defense. The court held

that to offer the extraneous offense to buttress identification testimony which was as yet unchallenged was probably error but was rendered harmless by the subsequent alibi testimony. *Id.* Here, identity was always a matter of circumstantial evidence and it was further questioned by appellant's raising of an alibi defense prior to the extraneous offense being offered into evidence. It was therefore proper to admit the evidence. Appellant's sixth point on appeal is overruled.

■ In his eighth and ninth points of error appellant claims that the State violated his constitutional rights to due process by not indicting him for roughly three and one-half years following the rape. Appellant filed a Motion to Dismiss for Pre-Indictment Prosecutorial Delay which was heard and subsequently overruled on June 5, 1989. At the hearing it was shown that appellant was arrested on January 29, 1985, for retaliation in connection with the threatening phone calls made to the victim of the rape. He was indicted for that offense on May 23, 1985, and again on September 26, 1985. He was convicted on the charge following the second indictment on July 9, 1987.

At the pretrial hearing on appellant's motion to dismiss a former assistant criminal district attorney testified that the grand jury which indicted appellant for retaliation also heard evidence concerning the 1984 rape since "the motive for the retaliation, dealt with the rape." No complaint of rape was ever presented to the grand jury and no indictment was sought or obtained from the grand jury during 1985 when appellant was charged with retaliation.

The police detective who investigated the rape testified that a person other than appellant was originally investigated and charged for the crime. When the charges were ultimately dropped, various items of physical evidence seized from that person were returned to him before ever being shown to the victim.

Appellant claims that by the time of trial, four years having passed since the crime was committed, the items of physical evidence taken from the prior suspect were not available to appellant. Furthermore, at least one potential alibi witness for appellant was no longer in the state and could not be found. Accordingly, appellant maintains that he suffered actual prejudice due to the lengthy delay in the State's initiating prosecution. *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

For appellant to succeed under *Lovasco* in showing that a preindictment delay worked to injure his constitutional rights to due process, he must show both actual prejudice and that the delay violates our "fundamental conceptions of justice." *Id.* at 790, 97 S.Ct. at 2049. Appellant argues that those fundamental conceptions are violated by the unexcused delay in the State's seeking an indictment. Here, appellant urges, the delay violates our fundamental conceptions of justice since testimony at the hearing on his motion to dismiss indicated that evidence of appellant's guilt for this offense was shown to the 1985 grand jury and that no new evidence was discovered between that time and the March 3, 1988, indictment for this offense.[5]

The State, on the other hand, contends that an unexcused delay in seeking indictment is not enough. The State claims that appellant must show that it intentionally delayed seeking an indictment merely to gain a tactical advantage. *Spence v. State*, 758 S.W.2d 597, 599 n. 3 (Tex.Crim.App. 1988), *United States v. Ballard*, 779 F.2d 287, 293 (5th Cir.1986). In fact, the Supreme Court quite explicitly rejected the respondent's implicit suggestion in *Lovasco* that a prosecutor should seek an indictment as soon as probable cause exists. *Lovasco*, 431 U.S. at 791, 97 S.Ct. at 2049.[6] In

---

**5.** Indeed, the record indicates that the only evidence generated or found after 1985 which was submitted at the trial was the testimony of an FBI fingerprint expert who received a photograph of the latent prints on the cigarette lighter

on December 8, 1988, nine months after indictment in this matter.

**6.** The Court gave three policy reasons for its holding. (1) Proceeding against one person in a criminal transaction could impair ability to

*Lovasco* the Court relied (with apparently little support in the record; *see Lovasco*, 431 U.S. at 798–99, 97 S.Ct. at 2053 [Stevens J. dissenting]) on representations by the State that the government delayed prosecution hoping to also collect evidence sufficient to indict participants in the offense other than the respondent. The Court distinguished those motives from the desire merely "to gain tactical advantage over the accused." *Id.* at 795, 97 S.Ct. at 2051, citing *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). In *Marion*, the Court held that such a tactical delay would violate our fundamental conceptions of justice. In *Lovasco*, the Court offered as dicta the government's concession that a knowing and reckless disregard by the prosecutor of the appreciable risk that delay would impair the ability to mount an effective defense could rise to the level of offending fundamental conceptions of justice so as to impair sixth amendment rights. *Lovasco*, 431 U.S. at 795 n. 17, 97 S.Ct. at 2051 n. 17.

There is no evidence here that the State intentionally delayed seeking an indictment to gain a tactical advantage. Further, the only prejudice to himself suggested by appellant is the loss of one material witness and the loss of possibly helpful material evidence. In *Lovasco*, though the loss of two defense witnesses were attributed to preindictment delay, the Supreme Court did not feel that constitutional rights had been impaired. Appellant only identifies one alibi witness as not available at the time of trial. He did introduce alibi testimony. Appellant has not shown that the added testimony of his lost alibi witness would have differed from or been more convincing than the three alibi witnesses he produced at trial. He also has no argument, apart from vague suggestions concerning lost material evidence, as to how the lost evidence would have helped his defense. *See Ballard*, 779 F.2d at 294. The harm appellant claims is elusive at best. That being the case, he also cannot meet the lower recklessness standard suggested in

*Lovasco*. There is no suggestion that the State should have anticipated the absence from the State of one of appellant's alibi witnesses or that it had reason to know of any exculpatory value of the evidence returned to the earlier suspect.

We hold that none of appellant's constitutional rights to due process were violated by the State's preindictment delay. Accordingly, points of error eight and nine are overruled.

Having overruled all nine points on appeal, the conviction and judgment in the court below are affirmed.

prosecute other parties to the offense. (2) Policy dictates that we do not force prosecutors into early (potentially costly) and possibly unwarranted prosecutions. (3) We should not force

the government to prosecute before it has weighed the social desirability of immediate prosecution. *Id.* at 793–94, 97 S.Ct. at 2050–51.