# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

==============

## NO. 03-00-00783-CR

==============

**Thomas Alton Taylor, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

==========================================================

### FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT
### NO. 8957, HONORABLE GUILFORD L. JONES III, JUDGE PRESIDING

==========================================================

Appellant Thomas Alton Taylor, Jr. was convicted of the offenses of aggravated sexual assault and nine counts of prohibited sexual conduct. *See* Tex. Pen. Code Ann. §§ 22.021(a)(1)(A)(i), (2)(A)(ii) (West Supp. 2002), 25.02(a)(1) (West 1994). Appellant's punishment was assessed by the jury at life imprisonment for aggravated sexual assault and imprisonment for ten years for each count of prohibited sexual conduct. Appellant asserts that the trial court erred in admitting in evidence two extraneous offenses. The judgment will be affirmed.

### Summary of Facts and Appellant's Complaints

In summary, appellant had non-consensual sexual relations with his biological daughter, T.J.L., from the time she was fifteen until she was thirty-five years old. The two moved frequently from state to state, and appellant held T.J.L. out to be his wife. They had two children before moving to Burnet County in 1998. On September 7, 1998, appellant terrorized T.J.L. by

putting a shotgun in her mouth and pulling the trigger of the unloaded weapon, and then sexually assaulting her. Appellant was also charged with engaging in incestuous sexual intercourse with T.J.L. during 1999. The State established through expert testimony that DNA evidence proved T.J.L. is appellant's biological daughter and that appellant is the biological father of her two children.

In the State's case-in-chief, the trial court, over objection, admitted evidence of two extraneous offenses—evidence that appellant assaulted T.J.L. twenty years earlier at her mother's grave site, and that appellant sexually assaulted another woman, K.R., in 1992.

Appellant insists that these offenses were nothing more than evidence of appellant's bad character and propensity for sexual assault, and that they were inadmissible under the Rules of Evidence. *See* Tex. R. Evid. 401, 402, 403, 404. Appellant argues that the two extraneous offenses furnished no evidence of probative value apart from propensity, but had great prejudicial effect on the jury. Furthermore, appellant argues that even though this was an "emotionally combustive case" the error in admitting the extraneous offenses should not be considered harmless, because to do so would encourage the use of such evidence in future cases.

**Additional Facts**

To determine whether the admission of the complained of evidence was error, and if error, whether it was reversible error, requires a more comprehensive examination of the evidence. T.J.L.'s mother died when T.J.L. was too young to have a remembrance of her. T.J.L.'s maternal grandparents adopted her and she lived with them until she was almost sixteen years old. T.J.L. could not remember ever seeing her father until he came to see her just before her sixteenth birthday. Appellant came to see T.J.L. and then took her to visit his mother. Appellant had a recreational

2

vehicle parked on his mother's property. Appellant took T.J.L. into the R.V. and instructed her to sit on the bed. Appellant then pulled T.J.L.'s dress up and removed her panties. T.J.L. cried and told him his conduct was not appropriate for a father. Appellant told her he wanted to see how she had grown over the years he had not seen her. Appellant then forcibly and against her will raped her. Appellant warned T.J.L. not to tell anyone or she would not see her grandmother and sister again. T.J.L. told her grandmother and her sister that appellant had raped her but they did nothing. Appellant took T.J.L. to live with him and without her consent continued to have sexual relations with her.

T.J.L. kept asking about her mother and wanted to go and see her mother's grave. Appellant took her to her mother's grave site one evening. There appellant bent her over her mother's tombstone and against her will forcibly raped her. Appellant told T.J.L. he wanted her mother to see what he did and he assured T.J.L. that her mother would not be waiting for her in heaven.

T.J.L. started to attend high school but she was soon accused of taking clothing belonging to another girl. Appellant went to the school to discuss the matter with the principal. While doing so, appellant physically attacked the principal. Soon thereafter, appellant took T.J.L. to Colorado. Appellant later took T.J.L. on an extended trek through Wyoming, Oregon, California, Arizona, and New Mexico. During their travels, appellant instructed T.J.L. not to talk much and not to look into the eyes of men. If appellant thought T.J.L. had violated his instructions, he beat her, kicked her, and pulled her hair. Because of appellant's bad treatment of T.J.L., she suffered black eyes, bruises, wounds, and scars. On some occasions, she had cuts on her body that either appellant

3

or she would close by sewing them shut with a needle and thread. Appellant obtained jobs for T.J.L. as a waitress in cafes and bars. Appellant would stay near at hand to watch her when she was working, and he took the money that she earned. Also, appellant forced T.J.L. to work as a topless dancer.

Eventually, they returned to Texas and lived in various places. Appellant continued his sexual relationship with T.J.L. She gave birth to a daughter and a son. Appellant required T.J.L. to have two abortions and finally required her to have her fallopian tubes tied so that she would not have more children. Over a period of years, appellant continued to beat, intimidate and totally control T.J.L.'s life. He seldom allowed her out of his presence; at times, he even required her to accompany him when he used the toilet. Appellant was seldom employed, but he obtained housecleaning jobs for T.J.L. and took the money that she earned. Appellant would not allow T.J.L. to celebrate her real birthday; instead, appellant allowed her to celebrate her birthday on Halloween.

While appellant and T.J.L. were living in a trailer park in 1992, T.J.L. became acquainted with K.R. who lived nearby. One day soon after they met, K.R. called and said that the man she was living with was "overmedicated" and she was afraid he would kill her. Appellant allowed K.R. to come to his trailer home and stay for the night. The next day K.R. wanted to return to the man she had been living with. When he came to get her, appellant sent T.J.L. outside to talk with that man. K.R. gathered her belongings, hugged appellant, and thanked him for letting her stay and protecting her the previous night. Appellant hugged and kissed K.R. in such an inappropriate manner that she admonished him that she was "not like that" and told him to "f___ off." Appellant became angry, grabbed her hand and inflicted great pain by squeezing the flesh between her thumb

4

and forefinger. Appellant told K.R. that he took what he wanted and that people didn't tell him "no." K.R. became very frightened. Appellant told her to take off her clothes. She was afraid not to do so. So she turned away from him and started to remove her clothes. He struck her, knocking her on to the bed. He then raped her and told her not to tell anyone. He told her if she did he would say it was consensual sex between adults. K.R. left with the man who had come after her.

The next day appellant went to K.R.'s trailer and told her that her mother had sent him so he could take her to her mother's house. However, appellant took K.R. back to his trailer. Appellant took control of K.R. and forced her to live in the trailer with him and T.J.L. Although she did not want to, appellant had sexual relations with K.R. whenever he wanted. K. R. gave birth to a son. Both T.J.L. and K.R. testified that they were forced to have sexual relations with appellant on demand.

According to their testimony, appellant completely dominated both women and their children. Appellant so completely controlled their lives that when they were not in his presence, he monitored them with a C.B. radio and an electronic bugging device. They could not leave the premises without appellant and could not have visitors. Appellant determined when they could eat and what television programs they could watch. At appellant's direction, T.J.L. and K.R. worked cleaning houses and he took the money that they earned.

In 1998, appellant and the two women moved to Burnet County where their trailer was located on property consisting of several acres. They built a fruit and vegetable stand beside the road. T.J.L., assisted by K.R., operated the roadside stand. Appellant took T.J.L. to the produce market in San Antonio in the early morning several times a week to get the fruit and vegetables that

5

they sold. Under appellant's control and direction, T.J.L. had a checking account; she could not write checks unless he told her she could. Money made at the fruit stand was given to appellant.

Appellant had a car and a truck. Neither of the women drove the car, and only on rare occasions was T.J.L. allowed to drive the truck. Appellant had a closet in which he kept his knife collection, his guns, and the women's clothes. The women slept in a lower bunk bed and appellant slept in the upper bunk. The children slept in a different room.

T.J.L.'s daughter was an albino with poor eyesight; she was enrolled and attended the school for the blind. An expert witness explained that albinism of their daughter resulted from the incestuous relationship of appellant and T.J.L. Appellant thought his daughter was special, and he treated her relatively well. Appellant liked his son born to K.R. and expected that son to carry on appellant's family name. Appellant disliked his son born to T.J.L. and treated him badly.

To rebut the State's evidence, defense counsel offered and the court admitted a number of photographs of appellant, T.J.L., K.R., and their children. It was argued that the photographs showed the women and children were smiling and happy. Defense counsel, in cross-examination, elicited testimony from K.R. that about once a year appellant allowed her to go to Dallas to spend a weekend with her grandparents. Also, although she was not allowed to attend her mother's funeral, K.R was allowed to visit her mother in Cuero and in Houston during the mother's last illness. K.R. testified that she was afraid to contact law enforcement authorities when she was apart from appellant. She was afraid of what he would do to her and was afraid he would be even more abusive toward T.J.L. K.R. did not believe that anyone, including law enforcement authorities, would believe her if she told of the situation in which she and the others lived.

6

It was appellant's bad treatment of T.J.L.'s son that caused T.J.L. and K.R. to finally seek help from law enforcement authorities. Appellant threw a metal cigarette lighter and struck the boy, and the women were afraid appellant was prepared to cause greater injury to the boy. They sent the boy to contact law enforcement authorities. Appellant was arrested, but the officers told T.J.L. and K.R. appellant's offense against his son would not warrant very severe punishment. While being interviewed by the officers, T.J.L. told them about the aggravated sexual assault for which appellant has now been convicted.

Just before September 9, 1998, the day the charged sexual assault was committed, appellant wanted Doug Cotton to eat supper with him and to sleep in the trailer that night so Cotton could get up early the next morning and move some dirt on the property. Appellant told T.J.L. to get Cotton a pillow and bedding, which she did. When she handed Cotton the pillow and bedding, Cotton thanked her and kissed her on the cheek. Appellant was enraged and threw Cotton out of the trailer. Appellant remained in an unusually bad mood, but did not take any action against T.J.L. until after they had returned their daughter to the school for the blind. That night while T.J.L. and K.R. were sleeping, appellant grabbed T.J.L. by the ankles and dragged her out of the trailer. He then placed a short barreled shotgun, which he called "junior," into her mouth. Appellant then asked her how it felt to know that she was "fixing to die." T.J.L. replied, "Relieved. Pull the trigger." Appellant pulled the trigger of the unloaded weapon. Appellant then raped her and without her having any clothing on, dragged her around the property through the brush. Based upon this incident, law enforcement officers charged appellant with aggravated sexual assault of T.J.L.

The State offered the testimony of Dr. Randall McIntyre, a psychiatrist who was board certified both in general and child psychiatry. After appellant's arrest, Victims Services of Burnet

7

County referred T.J.L. to Dr. McIntyre. During the months before appellant's trial, Dr. McIntyre saw and treated T.J.L. on several occasions. When he first met T.J.L., she was accompanied by a victim's services counselor. T.J.L. was "cowering, fearful" and would not meet his gaze. She was hypervigilant, primarily toward appellant. Dr. McIntyre found T.J.L. to be suffering from post-traumatic stress disorder and depression. He described post-traumatic stress disorder as a normal response to an abnormal circumstance. When the abnormal circumstance is outside of the realm of normal behavior, it causes terror, horror, and distress in almost anyone.

In the course of her treatment, T.J.L. told Dr. McIntyre about being raped by appellant the day she met him and about later being raped by him over her mother's grave. Dr. McIntyre testified that the abuse, rape, and beatings that T.J.L. had received would certainly cause her long-term damage. "Specifically, she had very significant fears of authority, which—incest in particular from father-daughter—undermines any sort of confidence in the people that take care of you." Dr. McIntyre testified that when persons are subjected to random acts of abuse, they are always expecting it is going to happen again. They are never comfortable. They are always looking for the next beating or rape. That T.J.L.'s father forced her into "subjugation" at the young age of fifteen made her feel more helpless and deprived her of the ability to react. Dr. McIntyre testified: "Teenagers have a sort of self-centered view of the world and things that occur they believe are their fault. When that feeling is confirmed by a sexual abuser or someone who is raping them, the belief is greater and they feel responsible for what is happening to them."

Dr. McIntyre also testified that in the absence of other support, the fact that appellant was both her father and the father and grandfather of her children would lead to significant bonding with appellant more than would be suspected. Also, continued isolation occurring over the period

8

of twenty years would increase a sense of helplessness and an inability to make decisions and certainly an inability to leave the situation. Dr. McIntyre prescribed anti-depression medications for T.J.L. as a treatment for her post-traumatic stress disorder, but she was unable to continue taking the medication. Although the medicines made her feel better, she was afraid feeling better might make her more vulnerable to her father.

**Extraneous Offense Involving K.R.**

In his first point of error, appellant asserts that the trial court erred in admitting evidence of a remote extraneous offense against a woman other than the victim of the charged offense. Already, we have summarized K.R.'s testimony relating to appellant's sexual assault on her six years before the commission of the charged offense of aggravated sexual assault on T.J.L. Appellant argues that the admission of K.R.'s testimony was error under the provisions of the Rules of Evidence. *See* Tex. R. Evid. 401, 402, 403, and 404.[1]

---

[1] **Rule 401. Definition of "Relevant Evidence"**

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**Rule 402. Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible**

All relevant evidence is admissible, except as otherwise provided by Constitution, by statute, by these rules, or by other rules prescribed pursuant to statutory authority. Evidence which is not relevant is inadmissible.

**Rule 403. Exclusion of Relevant Evidence on Special Grounds**

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

9

To summarize, these rules provide that evidence a defendant committed another criminal offense is not admissible to show his propensity to commit criminal offenses and the likelihood that he committed the charged offense. *See Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996). However, an extraneous offense may be admissible if (1) admitted for a purpose other than character conformity, (2) its admission is not barred by constitutional or statutory prohibitions, and (3) it has relevance to a fact of consequence necessary to prove or disprove the charged offense. *See id*. Non-exclusive purposes for which extraneous offense evidence may be admissible are to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See id.*; Rule 404(b).

Before admitting the complained of evidence, the trial court conducted a hearing out of the presence of the jury in which K. R. testified fully about appellant's sexual assault on her.

---

misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence**.**

**Rule 404. Character Evidence not Admissible to Prove Conduct; Exceptions; Other Crimes**

**(a) Character Evidence Generally**. Evidence of a person's character or character trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: . . .

**(b) Other Crimes, Wrongs or Acts.** Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

Tex. R. Evid. 401, 402, 403, 404(a), (b).

Defense counsel objected and both the defense and prosecution presented argument to the trial court. After hearing K.R.'s voir dire testimony, defense counsel's objections, and counsels' arguments, the trial court ruled K.R.'s testimony was relevant and admissible "to show common plan, scheme, intent, continuing course of conduct, and consent or the lack thereof, of the victim to the aggravated assault in question." Also, the trial court found that K.R.'s testimony about the offense against her was "intertwined" and "part and parcel of the same continuing crimes." After expressing some concern "vis-á-vis Rule 403," the trial court ruled K.R.'s testimony had "probative value not grossly outweighed by the prejudicial effect."

Before admitting K.R.'s testimony, the court admonished the jury:

Ladies and gentlemen of the jury, you are possibly going to now be hearing testimony regarding allegations of other sexual assaults and other possible offenses, other than the events charged in the indictment.

You're therefore instructed that you cannot consider such testimony for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other acts or offenses, if any were committed. And even then you may only consider the same in regard to common plan or scheme, intent, continuing course of conduct; or consent, or lack thereof, of the victim, T.J.L., . . . in connection only with the offense as alleged in the indictment against the Defendant of aggravated sexual assault of T.J.L. on or about September 7, 1998, and for no other purpose.

Also, in its jury charge the trial court included an instruction limiting the purpose for which the jury could consider evidence of extraneous offenses.

Appellant's sexual assault on K.R. six years before his aggravated assault on T.J.L. does not show a common plan or scheme. The evidence merely shows appellant committed two separate offenses. Other than its value to show appellant's propensity and character, evidence of the

offense committed against K.R. makes it no more or no less probable that he committed the charged offense against T.J.L. T.J.L.'s lack of consent and appellant's intent were inferable from the evidence of the charged offense. K.R.'s lack of consent to the offense committed on her made it no more or no less probable that T.J.L. did or did not consent to the charged offense committed against her. There is no evidence that the extraneous offense against K.R., committed six years before the charged offense, was "intertwined" with or "part and parcel of the same continuing offense." Evidence to prove these two offenses was entirely separate. Other than to show appellant's character and propensity, evidence of the extraneous offense had little probative value. When evidence has no relevance apart from character conformity, it is absolutely inadmissible. *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990).

We conclude that the trial court's ruling admitting in evidence the remote extraneous offense against a different woman was outside the boundaries of its discretion. Admission of the extraneous offense constituted error. We must decide whether the admission of the extraneous offense constituted reversible error.

Rules of Appellate Procedure provide the rule for determining reversible error. *See* Tex. R. App. P. 44.2. Other than constitutional error, any error must be disregarded unless it affects substantial rights of the defendant. *Id*. Rule 44.2(b). The violation of a rule of evidence in the admission of evidence, as in this case, is considered non-constitutional error. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997); *Tate v. State*, 988 S.W.2d 887, 890 (Tex. App.—Austin 1999, pet. ref'd).

12

A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000) (citing *King*, 953 S.W.2d at 271). A criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but slight effect. *Id*. (citing *Johnson*, 967 S.W.2d at 417). In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in this case. The reviewing court might also consider the jury instruction given by the trial judge, the State's theory and any defensive theories, closing arguments and even voir dire, if material to appellant's claim. *Id*. (citing *Llamas v. State*, 12 S.W.2d 469, 471 (Tex. Crim. App. 2000)).

We have summarized the vast amount of evidence relating to appellant's abuse of T.J.L. over a period of twenty years leading up to the commission of the charged offense. T.J.L. was battered and bruised physically and psychologically and was forced to support appellant by working at jobs that even included topless dancing. It began just before T.J.L.'s sixteenth birthday. On the day that she first met her biological father, he raped her. For twenty years, appellant kept T.J.L. constantly in his presence and isolated from other people. Appellant forced T.J.L. into the unnatural relationship of appearing to be his wife. For twenty years, appellant forced T.J.L. to engage in an on-going incestuous sexual relationship with him that resulted in the birth of two children—two children who were physically, and quite likely, psychologically marked for life. Appellant's conviction for

aggravated sexual assault of T.J.L. resulted from his unreasonable, jealous rage directed at T.J.L. for an act in which she appeared to be blameless. Appellant threatened to kill T.J.L. and treated her brutally in committing the charged offense. It is unnecessary for us to repeat all of the facts of the case that we have summarized above. The trial court's error in admitting the extraneous offense was mitigated by the court's limiting instruction when the evidence was admitted and in the jury charge. Although we cannot be absolutely certain, based on our collective experience and judgment, we believe the jury's guilty verdict and the punishment assessed would have been the same in the absence of the extraneous offense evidence furnished by K.R.'s testimony

We do not take lightly appellant's concern that finding this error harmless will encourage the use of such evidence in future cases. However, we have found that the admission of the extraneous offense was error. We do not anticipate that trial judges will admit inadmissible evidence relying upon an appellate court's finding the error harmless. After examining the entire record, we conclude that there is little likelihood that the error had a substantial and injurious effect on the jury's verdict; from our review of the record, we have fair assurance that the error did not influence the jury or had but slight effect. Appellant's first point of error is overruled.

**Extraneous Offense Against T.J.L.**

In his second point of error, appellant complains of the admission of evidence that twenty years before the commission of the charged offense, appellant bent T.J.L. over her mother's tombstone and raped her. *See* Tex. R. Evid. 401, 402, 403, and 404(b).

14

To determine whether the complained of evidence should be admitted, the trial court conducted a hearing out of the presence of the jury. Both T.J.L. and a psychiatrist testified at length. After hearing the testimony, appellant's objections, and counsels' arguments, the trial court ruled:

> [T]he complained of evidence is relevant, that in the 403 analysis, that the probative value is not grossly outweighed by the prejudicial effect. And it meets the exceptions under 404(b), including practically the entire laundry list and more. Court specifically finds that it establishes motive, intent, opportunity, a scheme, and that it is entirely contextual to the entire offense. Those items will be admitted on that basis.

Before admitting the complained of testimony of T.J.L., the trial court gave the jury substantially the same limiting instruction that was given before K.R.'s testimony was admitted. A limiting instruction was included in the jury charge.

Evidence of uncharged offenses may be admissible to show motive or to rebut a defense theory. *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000); *Montgomery v. State*, 810 S.W.2d 372, 388-89 (Tex. Crim. App. 1990) (op. on reh'g); and *see Bevers v. State* 811 S.W.2d 657, 662 (Tex. App.—Fort Worth 1991, pet. ref'd) (evidence that defendant raped the same victim seven years before charged offense held admissible to show motive). Motive is not an essential element of any criminal offense, but that evidence is generally admissible because it is a relative circumstance tending to prove the commission of an offense. *See Bush v. State*, 628 S.W.2d 442, 444 (Tex. Crim. App. 1982); *Rodriguez v. State*, 486 S.W.2d 355, 358 (Tex. Crim. App. 1972). To be admissible as proof of motive, the evidence must fairly tend to raise an inference in favor of the existence of a motive on the part of the accused to commit the offense for which he is on trial. *Id*.; *Massey v. State*, 826 S.W.2d 655, 658 (Tex. App.—Waco 1992, no pet.). The admissibility of evidence of an

15

extraneous offense as a motive is usually required to relate to other acts by the accused against the victim of the offense for which the accused is being tried. *Foy v. State*, 593 S.W.2d 707, 708-09 (Tex. Crim. App. 1980); *Zuliani v. State*, 903 S.W.2d 812, 827 (Tex. App.—Austin 1995, pet. ref'd).

Also, extraneous offenses are admissible to rebut defensive theories raised by the testimony of State's witnesses during cross-examination. *Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1994); *Crank v. State*, 761 S.W.2d 329, 341 (Tex. Crim. App. 1988).

It is important to remember that, in determining whether evidence of extraneous offenses is properly admitted, the analysis is always to be conducted within the framework provided by the unique facts and circumstances of each particular case. *Crank*, 761 S.W.2d at 342; *Massey*, 826 S.W.2d at 658. This analysis is for the trial judge in the first instance and, absent a clear abuse of discretion, his decision will not be disturbed on appeal. *Crank*, 761 S.W.2d at 342; *Templin v. State*, 711 S.W.2d 30, 33 (Tex. Crim. App. 1986). The admissibility of evidence of extraneous offenses may to some extent depend upon the burden of proof imposed on the State, and the type of evidence which the State has to offer in proof of the essential elements of its case. *Crank*, 761 S.W.2d at 341.

Arguing both before the trial court and before the jury, defense counsel recognized that *motive* was an important issue in this case. In his closing jury argument defense counsel argued, "this case is about credibility and it's about motive . . . . You have to take the word of T.J.L. . . . Because there is no evidence of this sexual assault with so-called junior, except as it comes from T.J.L." Further, counsel argued, "And as to motive, how did all of this get started? It all started with this accusation that Tom Taylor threw a metal cigarette lighter at his son . . . . And from that, all of

16

this comes." Defense counsel questioned T.J.L.'s credibility and the truthfulness of her testimony. Defense counsel through cross-examination and in jury argument made a sustained effort to cast doubt on T.J.L.'s uncorroborated testimony relating to the charged offense of aggravated sexual assault.

To prove the commission of the charged offense, the State had to rely for the most part on T.J.L.'s uncorroborated testimony. Evidence showing appellant's motive was an important circumstance to present to the jury. It appears the State's theory was that appellant's motive in committing the charged offense was to maintain his unbridled control and power over T.J.L. and to show his unnatural lust for her. The evidence tends to show appellant wanted to make T.J.L. cater to his every want, to show her who was boss, and to make her submit, please, and obey him.

The trial court gave careful preliminary consideration to the proffered evidence and carefully instructed the jury of the limited purpose for which the evidence was being admitted. The court found evidence of the extraneous offense relevant and that its probative value was not grossly outweighed by its prejudicially effect. We conclude the trial court did not abuse its discretion in admitting this extraneous offense evidence. The trial court's ruling is supported by the record; it will not be disturbed on appeal.

Even if we assumed *arguendo* that admission of the evidence was error, we do not believe the error affected appellant's substantial rights. *See* Tex. R. App. Proc. 44.2(b); Tex. R. Evid. 103(a). That is, given all of the evidence before the jury, we believe it quite unlikely that the admission of the evidence in question had a substantial effect on the jury's verdict. *See Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999). Appellant's second point of error is overruled.

17

The judgment is affirmed.

_____
Carl E. F. Dally, Justice

Before Justices Kidd, Puryear and Dally[*]

Affirmed

Filed:   January 10, 2002

Do Not Publish

_____

[*]   Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).